**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PORTSIDE TOWERS WEST TENANT ASSOCIATION, PORTSIDE TOWERS EAST TENANT ASSOCIATION, KEVIN WELLER, JESSICA BRANN, MICHELE HIRSCH, and JOEL ROTHFUS,<br><br>　　　　　　　　Plaintiffs,<br>v.<br><br>THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC, EQUITY RESIDENTIAL & EQUITY RESIDENTIAL MANAGEMENT, LLC,<br><br>　　　　　　　　Defendants. | Civil Case No.: 24-cv-07508<br><br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Portside Towers West Tenant Association, Portside Towers East Tenant Association, Kevin Weller, Jessica Brann, Michele Hirsch, and Joel Rothfus, (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendants The Towers at Portside Urban Renewal Company, L.L.C., Equity Residential, and Equity Residential Management, LLC (collectively, "Defendants"), and allege upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

**NATURE OF THE ACTION**

1.　　　This is a class action lawsuit for, *inter alia*, violations of the New Jersey Consumer Fraud Act, unjust enrichment, and common law fraud against Defendants regarding Buildings located at 100 Warren Street, Jersey City, New Jersey ("100 Warren" or "Portside West") and 155 Washington Street, Jersey City, New Jersey ("155 Washington" or "Portside East") (collectively, the "Buildings").

2.      More specifically, for the past 20+ years, Defendants have knowingly and improperly employed a scheme to defraud Tenants of the Buildings and evade applicable rent control regulations through a calculated pattern of non-compliance, deception, misrepresentations, and false exemption claims. To wit, Defendants have knowingly and deceptively charged rent to Tenants at the Buildings well in excess of the applicable rent control rates, all-the-while misrepresenting the rent control status of the Buildings, despite that such Buildings are ***not exempt*** from the applicable rent control laws, ordinances, and regulations.

3.      In fact, on October 19, 2023, the City of Jersey City Rent Leveling Board (the "RLB") expressly declared that Defendants failed to comply with the applicable rent control regulations and are ***not, and have never been, exempt*** from the City of Jersey City's (the "City") rent control and rent leveling laws.  Accordingly, based on the determination of the RLB, it is undisputed that Defendants have been improperly charging rent to Tenants of the Buildings in excess of applicable rent control and rent leveling amounts.

4.      Nonetheless, despite the clear and unambiguous ruling of the RLB, Defendants continue to flout applicable law and disregard the rights of the Tenants by continuing their unlawful scheme of imposing and collecting rents in excess of the appropriate base rent control amounts, including by issuing unlawful rent increases to current Tenants, commencing eviction actions against Tenants refusing to pay unlawfully charged rents and other fees, and entering into lease agreements with new Tenants that include rents well in excess of the applicable rent control and rent leveling amounts.

5.      Based on the foregoing, as further set forth below, Defendants have improperly charged and collected **over $140 million** in excess rent from **thousands** of Tenants[1] and continue to do so despite the RLB's express declaration that such conduct is unlawful.  With interest and treble damages under the New Jersey Consumer Fraud Act, potential punitive damages for common law fraud, and other forms of relief sought, total damages sought are not less than $400 million.

6.      If left unchecked, Defendants' conduct will continue, resulting millions of dollars in **additional** harm to Plaintiffs and the proposed class, and will continue to force countless tenants from their homes.  Defendants' continued demise of affordable rental housing in Jersey City must not be countenanced.

7.      For these reasons, as further set forth below, Defendants are liable to Plaintiffs for, among other things, violation of the New Jersey Consumer Fraud Act, N.J.S.A., 56:8-1, et seq., unjust enrichment, and common law fraud. Plaintiffs seek, among other forms of relief, compensatory damages, treble damages under the Consumer Fraud Act, punitive damages, restitution, attorneys' fees, and interest in an amount to be determined at trial, as well as injunctive and declaratory relief.

## **PARTIES**

8.      Plaintiff Portside Towers West Tenant Association ("PTWTA") is an unincorporated tenant's association, consisting of current and former tenants in the building informally known as 100 Warren Street, and has been authorized by the current and former tenants of that building to act on their behalf.   PTWTA's members have been directly harmed by

---

[1] Tenants includes Plaintiffs and all current and former tenants of the Buildings during the applicable period.

Defendants' unlawful practices and assert claims on behalf of all members to remedy such unlawful conduct.

9.      Plaintiff Portside Towers East Tenant Association ("PTETA") is an unincorporated tenant's association, consisting of current and former tenants in the building informally known as 155 Washington Street, and has been authorized by the current and former tenants of that building to act on their behalf.  PTETA's members have been directly harmed by Defendants' unlawful practices and assert claims on behalf of all members to remedy such unlawful conduct.

10.      Plaintiff Kevin Weller ("Weller") is a tenant residing in Portside East and is a member and President of PTETA. Weller has been subjected to unlawful rent overcharges and other violations of applicable rent control law by Defendants.

11.      Plaintiff Jessica Brann ("Brann") is a tenant residing in Portside East and is a member of PTETA.  Brann has been subjected to unlawful rent overcharges and other violations of applicable rent control law by Defendants.

12.      Plaintiff Michele Hirsch ("Hirsch") is a tenant residing in Portside West and is a member and President of PTWTA.  Hirsch has been subjected to unlawful rent overcharges and other violations of applicable rent control law by Defendants.

13.      Plaintiff Joel Rothfus ("Rothfus") is a tenant residing in Portside West and is a member of PTWTA . Rothfus has been subjected to unlawful rent overcharges and other violations of applicable rent control law by Defendants.

14.      Defendant The Towers at Portside Urban Renewal Company, LLC ("Portside") is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business in New Jersey. Portside is the owner of the Buildings.

15.     Defendant Equity Residential ("EQR") is a publicly traded real estate investment trust (REIT) that invests in residential apartments, with annual revenues exceeding $2.7 billion. EQR is the parent company of Equity Residential Management, LLC and exercises control over the policies and practices implemented at the Buildings.

16.     Defendant Equity Residential Management, LLC ("Equity") is a limited liability company organized under the laws of Illinois, with its principal place of business in Chicago, Illinois. Equity, a subsidiary of EQR, serves as the management agent for Portside and manages the Buildings.

17.     Defendants, individually and collectively, are responsible for the rental policies, practices, and decisions implemented at the Buildings, including but not limited to setting rental rates, enforcing lease terms, and ensuring compliance with applicable laws and regulations.

## JURISDICTION & VENUE

18.     This Court has original jurisdiction over all claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a proposed class action in which: (a) there are 100 or more members in the proposed class; (b) at least some members of the proposed class have a different citizenship from the Defendants; and (c) the claims of the proposed class members exceed $5,000,000.00 in the aggregate, with total damages sought not less than $400 million.

19.     The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the New Jersey state law claims because those claims derive from a common nucleus of operative fact.

20.     The Court has personal jurisdiction over Portside as it is an entity that is organized and existing under the laws of the State of New Jersey, with its principal place of business located in New Jersey, which regularly transacts business in New Jersey.  Additionally, Plaintiffs' causes of action arise out of Portside's conduct in the State of New Jersey.

21.     The Court has personal jurisdiction over EQR and Equity because Plaintiffs' causes of action against these entities arise out of and relate to their systematic and continuous contact with the forum state, including their management of Portside.  Among other things, these entities purposefully availed themselves of the privilege of conducting activities within this District, including through their management of Portside, such that maintenance of this action against them in this District does not offend traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district.

## RELATED PROCEEDINGS

23.     The facts and circumstances set forth in this action relate to several ongoing proceedings that involve similar parties and issues; however, the present case is distinct and addresses unique harms that are not fully captured or addressed in these related proceedings.

24.     More specifically, on December 19, 2023, Plaintiffs PTWTA and PTETA filed a complaint in lieu of prerogative writ in the Superior Court of New Jersey, Hudson County, Docket No. HUD-L-004857-23 (the "State Action"), seeking to enforce the RLB's finding that the Buildings are subject to rent control.  The State Action, however, does not address the broader pattern of fraudulent conduct and consumer protection violations alleged in the present case. Moreover, in the State Action, the plaintiffs are not seeking the civil monetary relief being sought in this case.

25.     Additionally, on November 10, 2023, Defendants filed a complaint in the United States District Court for the District of New Jersey, Civil Action No. 2:23-cv-22291-MCA-JRA (the "Federal Action"), challenging the RLB's determination on constitutional grounds.  However,

the Federal Action does not address the consumer fraud alleged herein. Furthermore, in the Federal Action, no parties therein are seeking the civil monetary relief being sought by Plaintiffs and Tenants in this case.

## FACTS

### A.   Relevant State and Local Laws

26.     New Jersey's Newly Constructed Multiple Dwelling Act, N.J.S.A. 2A:42-84.1, et seq. (the "Act") permits developers of new construction projects to apply for exemptions from municipal rent control ordinances, provided explicit and strict eligibility criteria are timely satisfied. More specifically, pursuant to the Act, owners claiming an exemption must file a written statement of their claim of exemption with the municipal construction official at least 30 days before the building's initial certificate of occupancy is issued. See N.J.S.A. 2A:42-84.4. Owners *exempted* under the Act, shall, prior to tenants entering into leases, serve tenants with a written statement on the applicable exemption status as well as the duration of the exemption, prior to tenants entering into leases in the affected units.

27.     The foregoing are strict prerequisites set by the statute and failure to comply with the statute's requirements means that an owner is not exempt via the Act, is subject to any rent control adopted now or in the future, and may not claim an exemption from municipal rent control. N.J.S.A. 2A:42-84.3 – 84.5.

28.     The Act further limits an owner's ability to claim an exemption from rent increases as follows:

   a.   The exemption only applies to multiple dwellings constructed after the effective date of the act, *i.e.*, 1987. See N.J.S.A. § 2A:42-84.2. Multiple Dwelling, in turn, is defined as "any building or structure and land appurtenant thereto containing four or more dwelling units, other than dwelling units constructed for occupation by senior citizens, rented or offered for rent to four or more tenants or family units." N.J.S.A. § 2A:42-84.1(e);

b. The Act limits the period of exemption for "a period of time, not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less." <u>N.J.S.A.</u> § 2A:42-84.2;

c. The Act requires that: "the owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owners claim of exemption from an ordinance under this act . . . ." <u>N.J.S.A.</u> § 2A:42-84.4;

d. The owner of a multiple dwelling claiming an exemption under the Act has two separate notice requirements concerning prospective tenants and those tenants entering into leases.

e. Prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, owners who qualify for the exemption shall furnish the prospective tenant with a written statement that the multiple dwelling in which the premises are located is exempt from rent control for such time as may remain in the exemption period.

f. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.

29.    The legislative intent regarding the strict nature of these requirements was unequivocally reinforced by the 1999 amendment to the Act (P.L. 1999, Chapter 291). This amendment explicitly stated: "This act shall take effect immediately and shall be applicable to all multiple dwellings or portions of multiple dwellings for which construction was completed prior to the effective date of this act, **provided that the owner of the multiple dwellings has fully complied with the requirements of section 4 of P.L.1987, c.153 (C.2A:42-84.4)." (emphasis added)**

30.    This legislative clarification establishes an incontrovertible standard for rent control exemption eligibility:

    a.  The filing of a claim for exemption under N.J.S.A. 2A:42-84.4 is not merely a procedural formality, but an absolute prerequisite for any rent control exemption.

    b.  The Legislature's use of the phrase **"fully complied"** underscores that partial compliance or substantial compliance is insufficient.

    c.  This statutory mandate applies to all multiple dwellings seeking exemption under the Act.

31.    The significance of this provision is clear:

    a.  It creates a bright-line rule for compliance with the filing requirement.

    b.  It applies retroactively, encompassing multiple dwellings constructed before the Act's effective date.

    c.  It reinforces that the filing requirement is an essential element of the exemption process.

32.    On or about February 7, 1986, the City adopted Ordinance, Chapter 260 governing rent control (hereinafter, the "Ordinance").

33.    The Ordinance incorporated provisions mirroring state law's stringent rules – *i.e.*, mandating that developers wishing to be considered for an exemption submit comprehensive exemption claims to the City's construction office at least 30 days prior to a certificate of occupancy being issued, or otherwise forfeit eligibility.  Amendments predicated access for exemption review upon this synchronization of notifications purposefully designed by legislature as a jurisdictional imperative for qualification.

34.    However, even where an exemption from "those provisions of the ordinance which limit the periodic or regular increases in base rentals of multiple dwelling units" applies, owners are still required to comply with other provisions of the Ordinance. See N.J.S.A. § 2A:42-84.2.

35.     For example, the Ordinance not only has various filing and reporting requirements that apply regardless of any statutory exemption, but also specifies how, and by how much, building owners of rental units are permitted to increase rents if they are not otherwise exempt. The Ordinance at Chapter 260-3 governs allowable rent increases for landlords that are not exempt pursuant to N.J.S.A. § 2A:42-84.1 et seq.

36.     Notably, pursuant to Chapter 260-3(D), landlords must supply each new tenant with a written statement detailing the prior tenant's rent within the first 10 days of the new tenancy. Failure to provide this information constitutes an illegal rent increase. Furthermore, Chapter 260-3(I) mandates that landlords must not misinform tenants concerning the rent paid by prior tenants, ensuring transparency and compliance with allowable rent increases.

37.     In addition, pursuant to the Ordinance at Chapter 260-3(H), a landlord shall register its rent roll with the Bureau in order to qualify for any rental increase. Pursuant to Chapter 260-9(E), "No … rent roll registration will be deemed filed with the [RLB] unless and until submitted on the [RLB's] official forms and accompanied by all appropriate supporting documents and information and the required filing fees."

38.     Moreover, pursuant to Chapter 260-3(J), "[t]he landlord shall provide each tenant a copy of the Truth-in-Renting Statement and subsequent amendments to said statement and be in full compliance with the landlord identity disclosure provision contained within the statement in order to qualify for any rental increase." These Truth-in-Renting Statements are a product of The Truth-in-Renting Act, N.J.S.A. 46:8-43 et seq.

39.     The current Truth-in-Renting Statements issued by the New Jersey Department of Community Affairs, Division of Codes and Standards, sets forth at page 22, under the heading "Identity of Landlord," language from N.J.S.A. §§ 46:8-27 to 37 and specifically, N.J.S.A. § 46:8-

28. This latter provision is from New Jersey's Landlord Identity Law ("Landlord Identity Law"), N.J.S.A. §§ 46:8-27 through 46:8-37, which provides, among other things, that every landlord must comply with certain registration and disclosure requirements and requires that same be provided to every tenant.

40. Specifically, the Landlord Identity Law, requires that the certificate of registration contain the following pertinent identifying information:

    a. The name and address of the record owner or owners and the record owners of the rental business, if not the same persons;

    b. If the record owner is a corporation, the name and address of the registered agent and corporate officers of said corporation;

    c. If the address of any record owner is not located in the county in which the premises are located, the name and address of a person who resides in the county in which the premises are located and is authorized to accept notices from a tenant and to issue receipts therefor and to accept service of process on behalf of the record owner;

    d. The name and address of the managing agent of the premises, if any;

    e. The name and address, including dwelling unit, apartment or room number of the superintendent, janitor, custodian or other individual employed by the record owner or managing agent to provide regular maintenance service, if any;

    f. "The name, address and telephone number of an individual representative of the record owner or managing agent who may be reached or contacted at any time in the event of an emergency affecting the premises … and who has authority to make emergency decisions concerning the building … and shall, at all times, have access to a current list of building tenants that shall be made available to emergency personnel . . . ."; and

    g. The name and address of every holder of a recorded mortgage on the premises.

41. Chapter 260-2(F)(1) of the Ordinance incorporates identical requirements as those found in the Landlord Identity Law at N.J.S.A. §§ 46:8-28(a) through (f), differing only with the additions of sections (g) and (h) as follows:

    a. Chapter 260(F)(1)(g) requires that the landlord include "a list of the base monthly rents of each housing space, by apartment or room number, within the dwelling as of January 1, 1983."

    b. Chapter 260-2(F)(2) requires that between January 1 and March 3 of each calendar year, all owners and/or landlords of dwellings shall file with the Bureau a new landlord registration statement for each dwelling owned.

    c. Chapter 260-2(G) also requires that the same information be posted at all times in the lobby, hallway or other conspicuous place within the dwelling.

42.    Furthermore, Chapter 260-2(G) states that if any information contained in the statement changes, the landlord shall inform each occupant or tenant of the change in writing within 30 days and correct the information posted within seven days after the change.

43.    Section § 260-3 of the Ordinance provides the relevant language concerning allowable increases to rents in buildings that are subject to rent control. That Section provides, in pertinent part, as follows:

    a. At the expiration of a lease or at the termination of a lease of a periodic tenant, no landlord of any dwelling as defined in § 260-1 may request or receive a percentage increase in rent which is greater than four percent or the percentage difference between the consumer price index three months prior to the expiration or termination of the lease and three months prior to the commencement of the lease term, whichever is less. For a periodic tenant or for a tenant whose lease term shall be less than one year, said tenant shall not suffer or be caused to pay more than one rent increase in any 12-month period, commencing 15 months prior to and ending three months prior to, the effective date of the proposed increase, whichever is less.

    b. No more than one such cost-of-living rental increase in any one twelve-month period shall be permitted irrespective of the number of different tenants occupying said housing space during said 12-month period.

    c. In the event of a vacant housing space, the landlord may raise the rental above the cost-of-living increase without prior application being made to the Bureau of Rent Leveling, and only if he or she has made capital improvements to the housing space. Such capital improvements will entitle the landlord to increase the base rent of the vacant unit by the following amount:

        i. For capital improvements up to $5,000.00 in value, the vacant unit's monthly base rent shall be increased by $1.35 per $100.00 of improvement; and

      ii.  For capital improvements in excess of $5,000.00, the vacant unit's monthly base rent shall increase by $1.55 per $100.00 of improvement.

d.  The landlord shall supply the following information in writing to any new tenant within the first 10 days of a new tenant's tenancy: the name of and rent paid by all tenants who occupied the apartment rented by the new tenant during the prior 12 months. The landlord shall keep a written record of the information described herein. The landlord shall make this record available to the Rent Leveling Administrator or Board upon request.

e.  The landlord shall register the rent roll with the Rent Leveling Bureau in order to qualify for any rental increase.

f.  If the landlord does not inform or misinforms the tenant concerning the rent paid by the prior tenants or in any manner illegally increases the tenant's rent, the Rent Leveling Bureau shall then accept, hear and adjudicate a compliance of an illegal increase.

g.  The landlord shall provide to each tenant a copy of the Truth-In-Renting Statement and subsequent amendments to said statement **and be in full compliance with the landlord identity disclosure provision contained within the statement in order to qualify for any rental increase.**

**B.**    <u>**History of the Buildings**</u>

44.    The Buildings, collectively known as 100 Warren Street and 155 Washington Street, are located on Block 60, Lot 34 on the tax map of the City of Jersey City (hereinafter the "Property").

45.    By deed dated September 20, 1988, the Property was transferred from Waterview Associates, a New Jersey general partnership, to DeMatteis/Waterview Associates, a New Jersey general partnership, for One Million Dollars ($1,000,000.00).

46.    Thereafter, on September 27, 1988, DeMatteis/Waterview Associates entered into a mortgage and mortgage note on the Property with Citibank, N.A. for One Hundred Twenty Million Dollars ($120,000,000.00). The amortization period of this Citibank mortgage was four (4) years.

47.     In 1989, the Office of the Construction Official for Jersey City ("Construction Official") issued building permit number 89-0504 to DeMatteis/Waterview Associates for the construction of Portside West.

48.     The property owner, DeMatteis/Waterview Associates, took out the loan and obtained all approvals to build condominiums for sale.

49.     On August 25, 1992, the Construction Official issued a Certificate of Occupancy for Portside West ("West CO").

50.     Following the completion of construction and the issuance of the West CO, the then Property owner defaulted on their mortgage to Citibank.

51.     It was not until June of 1994, pursuant to Ordinance 94-062, two (2) years after completion of construction, that Citibank and Jersey City agreed that Portside West, originally constructed as a condominium project, and not as a multiple dwelling as defined in the Act, would be used for rental apartments.

52.     Following a foreclosure on the Property by Citibank, on November 23, 1994, the Hudson County Sheriff issued a Sheriff's Deed transferring the Property to Portside Apartments Urban Renewal Partners, LP.

53.     By letter dated November 23, 1994, nearly two (2) years and two (2) months after the issuance of the West CO for Portside West, Portside Apartments Urban Renewal Partners, LP sent a letter to the Construction Official stating that pursuant to N.J.S.A. § 2A:42-84.4, Portside Apartments Urban Renewal Partners, LP considered Portside West to be exempt from the Ordinance.  This letter cited N.J.S.A. § 2A:42-84.4 as the basis for the exemption claim. This belated correspondence, occurring long after the completion of construction, significantly deviated from the statutory requirements for filing a timely exemption claim under the Act, which explicitly

requires the original owner of a ***newly constructed multiple dwelling***, to file such a claim at least 30 days prior to the issuance of a certificate of occupancy.

54.     On January 24, 1995, the Construction Official issued a Certificate of Continued Occupancy for Portside West. It is crucial to note that this document differs significantly from a Certificate of Occupancy. A Certificate of Continued Occupancy is issued for an already constructed building, not for new construction as stipulated by N.J.S.A. 2A:42-84.1.a. This further underscores the inapplicability of the exemption claim to Portside West.

55.     Upon information and belief, at some point after acquiring title to the Property on November 23, 1994, but prior to 1996, Portside Apartments Urban Renewal Partners, LP changed the ownership entity of the Property to Portside Apartments Urban Renewal Company, L.L.C., without recording a deed for such change in ownership.

56.     On or about July 18, 1996, Portside Apartments Urban Renewal Company, LLC entered into a mortgage on the Property with Fleet Bank, N.A. for Sixteen Million Five Hundred Thousand Dollars ($16,500,000.00) ("Fleet Mortgage").

57.     On the same day, July 18, 1996, Portside Apartments Urban Renewal Company, LLC, entered into a mortgage on the Property with The Northwest Mutual Life Insurance Company for Twenty-two Million Five Hundred Thousand Dollars ($22,500,000.00) ("Northwestern Mutual Mortgage").

58.     Both the Fleet Mortgage and the Northwestern Mutual Mortgage had an amortization period ending in July of 2006.

59.     In July of 1996, Portside Apartments Urban Renewal Company, LLC began construction of Portside East, the second of the Buildings, pursuant to Building Permit numbered 89-0504, which was the same permit number issued for Portside West.

60.     The Certificate of Occupancy for Portside East was issued on December 31, 1997 ("East CO").

61.     The owner at the time, Portside Apartments Urban Renewal Company, LLC, did not file a claim of exemption with the Construction Official. Indeed, it is undisputed that Portside Apartments Urban Renewal Company, LLC failed to send any letter to the Construction Official claiming an exemption for Portside East, as required by N.J.S.A. § 2A:42-84.4, prior to the issuance of the certificate of occupancy for such property.

62.     On or about June 10, 1998, both the Fleet Bank Mortgage and the Northwestern Mutual Mortgage were satisfied of record and discharged.

63.     Thereafter, by deed dated June 11, 1998, Portside Apartments Urban Renewal Company, LLC transferred the Property for One Hundred Dollars ($100.00) to the current owner, Portside.

64.     On June 11, 1998, the same day that Portside assumed ownership of the Property, Portside took out a new mortgage on the Property for Fifty-eight Million Five Hundred Thousand Dollars ($58,500,000.00) with Northwestern Mutual Life Insurance Company (the "New Mortgage").

65.     The amortization period of the New Mortgage was until July 1, 2008 and the New Mortgage was discharged on July 9, 2008.

66.     Throughout their operation and ownership of the Buildings, Defendants failed to abide by the Ordinance and Act.

67.     Throughout their operation and ownership of the Buildings, Defendants failed to abide by the New Jersey statute governing an exemption from those provisions of the Ordinance which limit the periodic or regular increases in base rentals of dwelling units.

68.     Throughout their operation and ownership of the Buildings, Defendants failed to file rent rolls with the City pursuant to the requirements of Chapter 260-3(H) and Chapter 260-9(E) of the Ordinance, which is a prerequisite for any increases in rent.

69.     Throughout their operation and ownership of the Buildings, Defendants failed to provide any tenant with the landlord certificate of registration required by N.J.S.A. § 46:8-28 and Chapter 260-3(J) of the Ordinance, which is a prerequisite for any increases in rent.

70.     Throughout their operation and ownership of the Buildings, Defendants have failed to comply with Chapter 260-2(F)(1)(g) of the Ordinance by providing each tenant with a list of the base monthly rents of each housing space, by apartment or room number, within the dwelling . . ."

71.     Throughout their operation and ownership of the Buildings, Defendants have failed to comply with Chapter 260-2(G) of the Ordinance by failing to post the landlord registration statement at all times in the lobby, hallway or other conspicuous place within the dwelling, which is a landlord identity disclosure prerequisite for any increases in rent per 260-3(J).

72.     Throughout their operation and ownership of the Buildings, Defendants have failed to file with the Bureau of Rent Leveling (the "Bureau"), between January 1 and March 3 of each calendar year, a new landlord registration statement for each dwelling owned, as required by Chapter 260-2(F)(2) of the Ordinance.

73.     Throughout their operation and ownership of the Buildings, Defendants have failed to inform occupants and tenants in writing, within 30 days, if any information contained in the landlord registration statement changes, in violation of Chapter 260-2(G), which is a landlord identity disclosure prerequisite for any increases in rent per 260-3(J).

74.     Throughout their operation and ownership of the Buildings, Defendants have failed to correct the posted information on the landlord registration statement within seven days after any

change, in violation of Chapter 260-2(G) of the Ordinance), which is a landlord identity disclosure prerequisite for any increases in rent per 260-3(J).

75.     Defendants engaged in a systematic pattern of fraudulent concealment designed to prevent tenants from discovering their rights under applicable rent control laws. This pattern included:

      a.   Providing false or misleading information in lease agreements;

      b.   Omitting required disclosures about rent control status;

      c.   Misrepresenting the basis for rent increases;

      d.   Submitting false statements to government agencies; and,

      e.   Using complex pricing algorithms to obscure the true nature of rent calculations.

76.     These actions were not mere oversight but part of a calculated strategy to conceal tenants' rights and the true legal status of the properties.

77.     Throughout their operation and ownership of the Buildings, Defendants have increased rents for the tenants of the Buildings above the lesser of four percent (4%) or the percentage difference between the consumer price index three months prior to the expiration or termination of the lease and three months prior to the commencement of the new lease term, in violation of Chapter 260-3(A) of the Ordinance.

78.     Throughout their operation and ownership of the Buildings, Defendants have increased rents in contravention of the provisions of Chapter 260-3(H) and (J) of the Ordinance.

79.     Throughout their operation and ownership of the Buildings, Defendants have failed to supply new tenants, within the first 10 days of the new tenant's tenancy, with the name of and rent paid by all tenants who occupied the apartment rented by the new tenant during the prior 12 months, in violation of Chapter 260-3(D) and 260-3(I) of the Ordinance.

80.     Upon information and belief, Defendants utilized pricing software provided by RealPage, Inc. to set and adjust rents. This software facilitates the sharing of competitively sensitive information among property owners and managers, effectively coordinating pricing decisions.

81.     The use of this algorithm, combined with Defendants' systematic violation of rent control laws, allowed for artificial inflation of rents above both legal limits and competitive market rates, constituting a potential per se violation of federal and state antitrust law.

82.     Throughout their operation and ownership of the Buildings, Defendants have charged new tenants rent in excess of that allowed by Chapter 260, without the authority to do so.

83.     On December 16, 2021, Defendants submitted a Landlord Registration Statement to Jersey City authorities, ***certifying that all 527 units in the Buildings were subject to rent control.*** **Exhibit A**. This certification was consistent with a June 5, 2020 registration for 155 Washington Street, which also acknowledged the Buildings' rent-controlled status.

84.     On December 29, 2021, the Jersey City Bureau of Rent Leveling responded to Defendants' certification with a "Notice of Incomplete 2021 Landlord Registration." **Exhibit B**. ***In complete alignment with the status of the Buildings as subject to rent control, the city's notice included a rent control enforcement notification***: "Notwithstanding the rejection of the Registration as incomplete, this Office will review the rents set forth in the Registration that has been signed and certified by the Landlord as accurate, and in the event there are rents that this Office deems are in violation of the JC Mun. Code Chapter 260 -- Rent Control, the Landlord and any affected tenants will be sent a Rent Leveling Administrator Preliminary Determination regarding such rents."

85.     Consistent with their previous certification and the city's enforcement notice, Defendants, on January 31, 2022, submitted another Landlord Registration Statement *again certifying that the Buildings were subject to rent control.*

86.     Despite their repeated acknowledgments of the Buildings' rent-controlled status, Defendants later attempted to claim exemption from rent control. On September 19, 2022, the Bureau definitively determined that 100 Warren and 155 Washington were not newly constructed in a redevelopment zone. Nevertheless, in a 2023 registration for 155 Washington Street, Defendants falsely claimed exemption based on "New Construction - 25+ units in a Redevelopment Area," directly contradicting the Bureau's determination and their own earlier admissions. This false statement, made under penalty of perjury, appears to be a deliberate attempt to circumvent rent control regulations, despite the fact that no exemption claim was ever filed by either of the Buildings respective original owner. These conflicting statements, made by high-ranking executives including First Vice President at EQR, James von Albade and Vice President, Investments at EQR, Wayne Ngai, demonstrate a pattern of inconsistent reporting and raise serious questions about the veracity of Defendants' claims regarding the Buildings' rent control status.

87.     These events demonstrate that both Defendants and city authorities understood and acknowledged the Buildings' rent-controlled status months before Plaintiffs filed their first petition claiming illegal rent on May 31, 2022.

88.     Despite these repeated admissions and the city's enforcement notice, Defendants continued to charge rents in excess of legal limits and fraudulently gave notice of an exemption that never existed, demonstrating willful and knowing violation of rent control laws.

89.     Defendants' conduct was egregious, as evidenced by their willful and knowing violations of rent control laws, their repeated false certifications to city authorities, and their

continued unlawful practices even after the RLB's explicit determination, warrants the imposition of punitive damages. Defendants' actions demonstrate a pattern of intentional misconduct and conscious disregard for tenants' rights and the law, persisting over many years and continuing even after official adjudication. Such conduct goes beyond mere negligence or oversight, representing a calculated strategy to defraud tenants while publicly acknowledging legal obligations.

**C.    The RLB Determination that the Buildings are Not Exempt from the Rent Control and Rent Leveling Laws**

90.     In or around 2020 and 2022, various City officials confirmed to inquiring tenants of the Buildings that the rent control laws applied to both Portside West and Portside East. However, in or around early 2022, tenants from both Buildings received various rent increases, many exceeding the 4% maximum permitted by the City's rent control ordinance (when prerequisite authorization requirements are met), with some increases soaring as high as 60%.

91.     These increases prompted some tenants to submit inquiries with the City's Rent Control Office as to whether they were subject to rent control. In a response email, the Rent Leveling Administrator advised that Portside West was indeed subject to rent control. In 2020, via a "see-click-fix" inquiry, Plaintiffs learned that Portside East was also subject to rent control.

92.     Accordingly, tenants from both Portside West and Portside East filed illegal rent petitions with the Bureau which, pursuant to Chapter 260-7(G) of the Ordinance, was submitted on behalf of all other tenants. Tenants of Portside East filed their petitions on or about May 31, 2022, and tenants of Portside West filed their petitions on or about June 25, 2022. Through their filings, the tenants claimed their rents were being illegally raised by their landlord. The filing was subsequently recognized by the Bureau. The property owner subsequently filed oppositions to the illegal rent petitions.

93.     Thereafter, on or around September 19, 2022, the Rent Leveling Administrator, through the Bureau, in an about-face manner from her prior written statement that the Buildings were, in fact, subject to rent control, issued a determination that they were exempt from rent control, in accordance with N.J.S.A. § 2A:42-84.1 et seq. There was no mention of her prior opinion, or that she was now reversing it.

94.     Thus, pursuant to the procedures afforded under the Ordinance (which, in addition to allowing petitions challenging illegal rents to be filed with the Bureau, also allows tenants to appeal Bureau determinations to the RLB), these tenants appealed the Rent Leveling Administrator's determination. These tenants filed their legal argument on February 7, 2023, the property owner filed its response on March 3, 2023, and the tenants filed their reply on March 24, 2023.

95.     After receiving the parties' submissions, the RLB held a hearing on May 31, 2023, where it heard arguments from the parties. Although separate appeals for the Buildings were filed, the RLB consolidated both matters. After the hearing, and at the suggestion of the RLB, the parties agreed to take part in mediation. The mediation, however, was unsuccessful, and the parties consequently returned to the RLB for a determination as to the illegal rent increases.

96.     The RLB convened on October 19, 2023, and issued a pivotal decision declaring that the respective, original property owners of both Buildings failed to comply with the requirements of N.J.S.A. 2A:42-84.1 et seq., concluding that the Buildings had always been subject to rent control, were ***not exempt***, and that the Buildings were in violation of applicable law (the "RLB Decision").  **Exhibit C**.

97.     As to Portside West, the RLB found that the Ordinance requires that the building owner file for the exemption "at least 30 days prior to the issuance of a certificate of occupancy

for the newly constructed multiple dwelling" and that based on the issuance of the certificate of occupancy on August 25, 1992, the owner did not timely avail itself of the exemption. *See id.* at p. 8.

98.     As to Portside East, the RLB held that the property owner was "clearly aware" of the requirement to file an exemption letter prior to the issuance of a certificate of occupancy, which is a "mandatory condition precedent" and "[t]here is no dispute that as it relates to [Portside East] that the record is devoid of any evidence of compliance with the notice requirement." *See id.*

99.     In concluding its analysis of this issue, the RLB stated that "[w]ith only speculation and conjecture as to whether the Property Owner has ever provided the required notice, the Board finds that the Property Owner has not fulfilled its obligation to provide notice under the Statute and, therefore, the units at 155 Washington are not exempt from the City's rent control ordinance." *Id.*

100.    The RLB thus concluded that "due to the failure by the Property Owner and its predecessor to comply with the notice requirement in <u>N.J.S.A.</u> § 2A:42-84.4, ***both buildings and all units therein are and have been for the duration of their occupancies subject to rent control*.*" *See id.* at p. 10 (emphasis added).  Significantly, the RLB held that there was no valid exemption from the beginning of the occupancy of the units.  *See id.*

101.    Despite the RLB's clear and unambiguous ruling, Defendants have continued to violate the Act and Ordinance and disregard the rights of the Tenants by overcharging tenants rent in excess of the applicable rent control rate.

**D.      Plaintiffs and Other Tenants of the Buildings Have Been Paying Rents Far in Excess of the Applicable Rent Control Rates**

102.     Plaintiffs and all other Tenants of the Buildings since inception have been paying rents substantially above the appliable rent control rates that Defendants should have been implementing.

103.     Plaintiff Weller moved into unit 2102 at Portside East (155 Washington Street) in April 2021, initially paying a monthly base rent of $4,534.  This initial rate was illegal as it did not conform to the legal base rent as defined in § 260-1 of the Ordinance, plus only those increases authorized under § 260-3. Per § 260-2(B), (C), and (D) of the Ordinance. Defendants also failed to provide Weller with the contact information and rental rates of all prior tenants for the preceding 12 months, as required by § 260-3(D) of the Ordinance and did not serve the mandatory landlord identity statement required by § 260-3(J).

104.     Defendants subsequently implemented additional unlawful increases to Weller's rent as follows: (i) Weller's rent from July 19, 2022 to July 18, 2023 increased to $6,102 per month; (ii) Weller's rent increased from July 19, 2023 to July 22, 2024 to $6,706 per month; and Weller's rent from July 23, 2024 to July 28, 2025 increased to $6,961 per month.

105.     Plaintiff Brann has been a co-tenant with Weller in unit 2102 at Portside East since April 2021.  Brann experienced the same initial illegal base rate and subsequent unlawful rent increases applicable to Weller.

106.     Plaintiff Hirsch has resided in multiple units at Portside Towers since September 2019. For each tenancy, the initial rate was illegal as it did not conform to the legal base rent as defined in § 260-1 of the Ordinance. Defendants failed to provide Hirsch with the required information on prior tenants' rents and contact details per § 260-3(D) and did not serve the mandatory landlord identity statement per § 260-3(J).

107.     Hirsch's rent history, all of which started from an illegal base rate, is as follows: (i) September 21, 2019 to September 22, 2020: $4,132 per month (unit 902, 100 Warren Street); (ii) September 23, 2020 to October 22, 2020: $4,215 per month (unit 902, 100 Warren Street); (iii) October 9, 2020 to June 19, 2021: $5,319 per month (unit 2305, 155 Washington Street); (iv) June 19, 2021 to June 13, 2022: $5,683 per month (unit 1807, 100 Warren Street); ; (vi) June 21, 2023-June 20, 24: $6676 per month; and (vii) her current lease of June 21- 2024- June 20, 2025: $6903 per month.  All rent increases suffered by Hirsch, whether for the same unit or a new unit, were illegal as they did not comply with § 260-3 of the Ordinance.

108.     Plaintiff Rothfus has been a co-tenant with Hirsch in each of the same units at Portside Towers since September 2019.  Rothfus experienced the same initial illegal base rate and subsequent unlawful rent increases applicable to Hirsch.

109.     The experiences of Weller, Brann, Hirsch, and Rothfus are typical of all current and former tenants of both Portside East and Portside West. All tenants have been subjected to unlawful rent increases from the very commencement of their tenancies, starting with illegal base rates that did not conform to § 260-1 of the Ordinance. Defendants consistently failed to provide required disclosures about prior tenants' rents and contact information (§ 260-3(D)) and did not serve the mandatory landlord identity statement (§ 260-3(J)).

110.     The rental rates for each of Weller, Brann, Hirsch, and Rothfus set forth herein represent only the base rent and do not include additional rent charges as defined in the applicable leases, such as late fees, returned item fees, parking and storage charges, utility bills, amenity fees, and other fees related to residency, which have further violated the rent control ordinance and increased the financial burden on tenants.

111.    The rent increases imposed on these Plaintiffs, unlawful from the very start of each tenancy due to illegal base rates and compounded by subsequent increases, demonstrate a pattern of systematic and pervasive overcharging by Defendants, in clear violation of applicable law. This pattern has affected all Tenants across both Buildings since the inception of their tenancies, resulting in significant financial hardship and, in some cases, even homelessness.

112.    As per § 260-2(D) of the Ordinance, all these unauthorized increases are "null and void and such excess rent shall be refunded or credited by the landlord forthwith."

**E.**    **Class Allegations**

113.    Plaintiffs bring this action on behalf of themselves and all other similarly situated current and former tenants of the Buildings pursuant to Federal Rule of Civil Procedure 23.

114.    Plaintiffs seek certification of the following Class:

> All current and former tenants of 100 Warren Street and 155 Washington Street who resided in 100 Warren Street and/or 155 Washington Street and who paid rent in excess of the legal rent control and/or rent leveling limits (the "Class").[2]

115.    The Class is so numerous that joinder of all members is impracticable. Although the exact number and identities of the members of the Class are currently unknown to Plaintiffs, it is reasonable to conclude that the practices complained of herein affected thousands, of current and former tenants of the Buildings.

116.    Virtually all factual, legal, and statutory relief issues that are raised in this Complaint are common to each of the members of the Class and will apply uniformly to every member of the Class.

---

[2]    Excluded from the Class are Defendants, their legal representatives, officers, directors, assigns, and successors, or any individual who has or had a controlling interest in Defendants.

117.    The claims of the representative Plaintiffs are typical of the claims of each member of the Class.   They, like all other members of the Class, sustained damages arising from Defendants' unlawful rent overcharges.   Indeed, each of the representative Plaintiffs are currently tenants of the Buildings and continue to be subject to rent in excess of the legal rent control limits.

118.    The representative Plaintiffs and the members of the Class are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct.

119.    The representative Plaintiffs will fairly and adequately represent and protect the interests of the Class and there are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate.

120.    The counsel selected to represent the Class will fairly and adequately protect the interests of the Class and have substantial experience in class and complex litigation and are competent counsel for this class action litigation.   Counsel for the Class will vigorously assert the claims of all members of the Class.

121.    This action is properly maintained as a class action in that common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members.

122.    Among the numerous questions of law and fact common to the Class are:

a.   Whether Defendants have a pattern, practice, or policy of charging Plaintiffs and tenants rent in excess of applicable rent control and rent leveling regulations;

b.   Whether Defendants have a pattern, practice, or policy of misrepresenting to tenants of the Buildings that the Buildings are exempt from rent control and rent leveling regulations;

c.   Whether Defendants have a pattern, practice, or policy of failing to provide rent-controlled leases to tenants of the Buildings;

d.  Whether Defendants' practices, acts, communications, and representations constitute unconscionable, abusive, deceptive, or fraudulent acts or practices in the conduct of a commercial practice in violation of N.J.S.A. § 56:8-2; and

e.  To what extent Plaintiffs and members of the Class are entitled to damages.

123.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy, including consideration of (a) the interests of the members of the Class in individually controlling the prosecution or defense of separate actions; (b) the impracticability or inefficiency of prosecuting or defending separate actions; (c) the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class; (d) the desirability of concentrating the litigation of the claims in a particular forum; and (e) the difficulties (or lack thereof) likely to be encountered in the management of a class action.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violation of the New Jersey Consumer Fraud Act)

124.   Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though fully set forth herein.

125.   The New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. § 56:8-2, prohibits, among other things:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

126.   The CFA defines the term "sale" to include any "sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute." N.J.S.A. § 56:8-1(e).

127.    Plaintiffs are persons as defined by the CFA as they and all Class members are natural persons as defined therein.

128.    Defendants are "persons" as defined by the CFA as they are business entities, corporations, or companies as defined therein.

129.    Defendants, in the course of advertising, promoting, and offering for rent the apartments in the Buildings, have engaged in unconscionable commercial practices, including deception, misrepresentations, knowing omissions of material fact and acts of fraud in violation of the CFA, including:

   a. Failing to disclose to tenants and prospective tenants of the Buildings that the Buildings are subject to Jersey City rent control and rent leveling regulations and are not otherwise exempt;

   b. Repeatedly acknowledging in official Landlord Registration Statements that the Buildings are subject to rent control, while simultaneously charging rents far in excess of legal limits;

   c. Charging and collecting rents from tenants of the Buildings substantially in excess of the applicable base rent (inclusive of any lawful increases thereto), in violation of the Act;

   d. Increasing the rents for tenants living in the Buildings in excess of the applicable base rent (inclusive of any lawful increases permitted thereto pursuant to Chapter 260-3(A)), including after the determination by the RLB that the Buildings are not rent control exempt;

   e. Utilizing deceptive and non-compliant 'Rent Control Addendum' documents in lease agreements as follows:

      i. From 1998 to mid-2022, Defendants' addendum falsely stated that the premises would be exempt from rent control "for a period of thirty years following the completion of construction at the Community." This language failed to disclose the actual duration of any claimed exemption as required by N.J.S.A. 2A:42-84.3, as it did not account for the possibility of a shorter exemption period based on the duration of the initial mortgage loan.

      ii. In mid-2022, Defendants briefly amended the addendum to reference the initial mortgage term but then deliberately reverted to the original, non-compliant language. This bait-and-switch tactic was a calculated

attempt to conceal the absence of any valid exemption and induce tenants to pay inflated rents.

f.  Failing to comply with the Truth-in-Renting Statement requirements of Chapter 260-3(J) of the Ordinance;

g.  Failing to provide a current and up-to-date landlord Certificate of Registration to each tenant as required by N.J.S.A. § 46:8-28 and N.J.S.A. § 46:8-29 and Chapter 260-3(J) of the Ordinance;

h.  Failing to post the updated Landlord Certificate of Registration within plain sight in each Building;

i.  Failing to provide new tenants with the name of and rent paid by all tenants who occupied the apartment being rented by the new tenant during the prior 12 months as required by Chapter 260-3(D) of the Ordinance;

j.  Failing to provide written notices to tenants of the Buildings prior to entering into lease agreements with such tenants notifying the tenants that the Buildings are exempt from rent control or rent leveling as required by N.J.S.A. § 2A:32-84.3.

k.  Continually and flagrantly disregarding the Rent Leveling Board's October 19, 2023 determination by:

   i.  Continuing to impose illegal rent increases after being explicitly informed of their non-compliance;

   ii.  Persisting in violations of the rent control ordinance despite clear notice of its applicability; and,

   iii.  Failing to take any corrective action to bring their practices into compliance with the law.

130.  Defendants are liable under the CFA for their unconscionable commercial practices, acts of deception and fraud, and misrepresentations without regard whether they had the intent to deceive, though it is clear that Defendants at times acted with such intent.

131.  Defendants had knowledge of the true rent control status of the Buildings, as evidenced by their repeated admissions in official Landlord Registration Statements signed by high-ranking executives under penalty of perjury.

132.    Despite this knowledge, Defendants intentionally concealed or misrepresented material facts concerning:

    a.  The true rent control status of the Buildings;

    b.  The legal rent amounts permitted under applicable rent control laws; and,

    c.  Tenants' rights under the Jersey City Rent Control Ordinance.

133.    Defendants had a duty to disclose these material facts to Plaintiffs and Class members based on:

    a.  The fiduciary nature of the landlord-tenant relationship;

    b.  The specific requirements of the Jersey City rent control ordinance; and,

    c.  Their superior knowledge of facts not readily available to tenants.

134.    Defendants intentionally concealed or suppressed these material facts with the intent to defraud Plaintiffs and Class members and induce them to:

    a.  Enter into lease agreements;

    b.   Pay unlawful rent amounts;

    c.  Renew leases at inflated rates; and,

    d.  Forgo their rights under rent control laws.

135.    Plaintiffs and Class members were unaware of the concealed facts and would not have acted as they did if they had known the truth about:

    a.  The rent control status of their units;

    b.  The actual legal rent amounts; and,

    c.  Their rights under the Jersey City Rent Control Ordinance.

136.    Defendants' fraudulent concealment was continuous and ongoing, preventing Plaintiffs and Class members from discovering their claims through the exercise of reasonable diligence. This concealment included, but was not limited to:

   a.   Providing false or misleading information in lease agreements;

   b.   Omitting required disclosures about rent control status;

   c.   Misrepresenting the basis for rent increases;

   d.   Submitting false statements to government agencies.

137.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs and Class members have suffered damages, including but not limited to:

   a.   Rent overcharges;

   b.   Overpayment for lease renewals;

   c.   Costs associated with moving due to unaffordable rents;

   d.   Emotional distress and inconvenience.

138.    Each unconscionable commercial practice, act of deception and fraud, misrepresentation and/or knowing omission/concealment of material fact by Defendants constitutes a separate violation of the CFA.

139.    By reason of Defendants' violation of the CFA, Plaintiffs and the proposed Class are entitled to reimbursement of all rental overcharges during the applicable period, treble damages of the overcharged rents, statutory penalties, interest, costs, and reasonable attorneys' fees.

140.    Based on the foregoing, Defendants are liable to Plaintiffs for, among other things, violations of the New Jersey Consumer Fraud Act, N.J.S.A., § 56:8-1, et seq., including treble damages, attorneys' fees, and interest in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment)

141.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though fully set forth herein.

142.    Defendants engaged in a deceptive scheme whereby they knowingly and falsely claimed that the Buildings were exempt from the applicable Jersey City rent control and rent leveling regulations and charged and collected rents from Plaintiffs and the Class in excess of those permitted to be charged and collected by the applicable rent control and rent leveling regulations.

143.    As a result, Defendants retained substantial monetary benefits at the direct expense of Plaintiffs and the Class.

144.    Defendants' retention of such monetary benefits without reimbursing Plaintiffs and the Class the amounts collected above and beyond the legal amounts that Defendants were entitled to charge for rent would be unfair, unjust, and inequitable.

145.    As a result of Defendants charging and collecting rent far in excess of what they would otherwise have been permitted by the applicable rent control and/or rent leveling regulations and failing to return such amount to the Class, Defendants have been unjustly enriched.

146.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and the Class have been injured and are entitled to damages, including restitution, punitive damages, attorneys' fees, and interest in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Common Law Fraud)

147.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though fully set forth herein.

148.    Defendants knowingly made false or material misrepresentations to Plaintiffs and Class members regarding the rent control status of the Buildings and the legality of the rents charged. These misrepresentations were material as they directly affected the rent amounts Plaintiffs and Class members were obligated to pay and their rights under rent control laws.

149.    Defendants' false representations included but were not limited to: (a) Falsely claiming that the Buildings were exempt from rent control; (b) Misrepresenting the duration and nature of any purported rent control exemption; (c) Providing inaccurate information about the legal rent amounts for units in the Buildings; (d) Submitting false and contradictory Landlord Registration Statements to Jersey City authorities regarding the rent control status of the Buildings.

150.    Defendants further engaged in deceptive practices, including: (a) Utilizing non-compliant 'Rent Control Addendum' documents in lease agreements from 1998 to mid-2022, falsely stating that the premises would be exempt from rent control "for a period of thirty years following the completion of construction at the Community"; (b) Deliberately reverting to non-compliant language in the Rent Control Addendum after briefly amending it in mid-2022, when the amendment exposed the invalidity of their exemption claim due to the short 4-year term of the initial mortgage loan; (c) Modifying the definition of "rent" in lease agreements in an attempt to circumvent rent control regulations, despite the clear and controlling definition provided in the Jersey City Municipal Code § 260-1.

151.    Defendants had knowledge of the falsity of these representations and they intended that Plaintiffs and Class members rely on these false representations to induce them to enter into lease agreements, pay inflated rents, and forgo their rights under rent control laws.

152.    Plaintiffs and Class members reasonably relied on Defendants' false representations in entering into and renewing lease agreements and paying rents in excess of legal limits. This reliance was reasonable given the fiduciary nature of the landlord-tenant relationship and Defendants' superior knowledge of the Buildings' legal status and applicable regulations.

153.    Plaintiffs and Class members could not have discovered the truth about the Buildings' rent control status and the illegality of the charged rents through reasonable diligence, due to Defendants' active concealment and misrepresentations.

154.    Defendants' conduct was willful, wanton, and malicious, demonstrating a reckless disregard for the rights of Plaintiffs and Class members.

155.    As a direct and proximate result of Defendants' fraud, Plaintiffs and the Class have been have suffered damages, including but not limited to rent overcharges, financial losses, emotional distress, and deprivation of rights and protections under rent control laws and are entitled to compensatory damages, punitive damages, attorneys' fees, and interest in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, seek the following relief:

A.   Designation of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs Portside West, Portside East, Weller, Brann, Hirsch, and Rothfus, as the Class Representatives of the Class;

C.   Appointment of Plaintiffs' counsel as Class Counsel for the Class;

D.   On the First Cause of Action, damages in an amount to be determined at trial, but in no event less than $400 million;

E.   On the Second Cause of Action, damages in an amount to be determined at trial, but in no event less than $140 million;

F.   On the Third Cause of Action, damages in an amount to be determined at trial;

G.   An award of punitive damages to the fullest extent permitted by law;

H.   An award of attorneys' fees and costs;

I.   An award of pre-judgment interest and post-judgment interest as provided by applicable law; and,

J.   Such other and further relief as the Court deems just and proper.

K.   A declaration that Defendants' actions violated the laws cited herein.

## <u>NOTICE TO ATTORNEY GENERAL OF ACTION</u>

Pursuant to <u>N.J.S.A.</u> § 56:8-20, a copy of this Complaint will be mailed to the Attorney General of the State of New Jersey within 10 days after filing with the Court.

## <u>DEMAND TO PRESERVE EVIDENCE</u>

Defendants are hereby directed to preserve all physical and electronic information pertaining in any way to Plaintiffs' cause of action and/or prayers for relief, and to any defenses to same, including, but not limited to, electronic data storage, closed circuit TV footage, digital images, computer images, cache memory, searchable data, emails, spread sheets, employment files, memos, text messages, any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook, Twitter, Instagram, LinkedIn, etc.), and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.

Dated: July 2, 2024

Respectfully,

MCLAUGHLIN & STERN, LLP

By:    /s/ *Mollie Hartman Lustig*
       Mollie Hartman Lustig, Esq.
       NJ Attorney ID No. 000862011
       One Elm Street, Suite 2
       Westfield, New Jersey 07090
       mlustig@mclaughlinstern.com

MCLAUGHLIN & STERN, LLP

By:    /s/ *Brett Gallaway*
       Brett R. Gallaway, Esq. (*pro hac vice* pending)
       /s/ *Jason Giaimo*
       Jason Giaimo, Esq. (*pro hac vice* pending)
       260 Madison Avenue
       New York, New York 10016
       bgallaway@mclaughlinstern.com
       jgiaimo@mclaughlinstern.com

ERIC J. NEMETH, P.C.

By:    /s/ *Eric Nemeth*
       Eric J. Nemeth, Esq.
       NJ Attorney ID No. 007431990
       55 Madison Avenue, Suite 400
       Morristown, New Jersey 07960
       enemeth@ejcounsel.com

MAROTTA & GARVEY

By:    /s/ *Neil Marotta*
       Neil D. Marotta, Esq.
       NJ Attorney ID No. 024781992
       3916 Bergenline Avenue, Suite 2200
       Union City, New Jersey 07087
       mglawyers@aol.com

# EXHIBIT A



**Steven M. Fulop**
**Mayor**

# CITY OF JERSEY CITY
### Department of Housing, Economic Development and Commerce
#### Division of Housing Preservation
#### Office of Landlord/Tenant Relations
342 MARTIN LUTHER KING DRIVE • JERSEY CITY, NJ 07305
PHONE: (201) 547-5127

# 2021 Annual Landlord Registration Statement - Five Units and More

Registration Opens January 1st and is due by March 3rd

**Registration Year**
2021

**Registration Type**
Annual Registration (Fee Due)

• Pursuant to JC Municipal Code Section 260-2F this Landlord Registration Statement must be filed with the Division of Housing Preservation, Office of Landlord/Tenant Relations between January 1 and March 3.
• Owners must file a revised Registration Statement within seven (7) days of any change in the information provided in the filed Registration Statement.

NOTE: Be sure when this registration is complete, to **SAVE IT BEFORE SUBMITTING** so that an account is established and revisions can be made in the future without having to rewrite information that has remained the same.

**In order to save and complete this Registration at a later time, you must provide your email address and select SAVE at the end of the Registration.**
krodriguez1@eqr.com

# SECTION A | PROPERTY INFORMATION

**House/Bldg No.**
155

**Street Name**
Washington Street-07302

**City/State**
JC/NJ

**A.K.A ADDRESS**

**Ward**
Ward F-Bergen/Lafayette

**Block**
60

**Lot**
34

**No. of Units**
527

[Ward Map](Ward Map)          [NJ Block/Lot](NJ Block/Lot)

**Is the property you are registering currently under rent control? If not, please attach proof of exemption.**
Yes

**Is the owner of record an entity (ie - Corporation, LLC, Partnership), not an individual or individuals?**
Yes

**Owner Entity**
Towers at Portside Urban Renewal Company LLC

**Owner Entity's Address**
230 West 41st Street, 12 Floor, New York, NY 10036

# Names and personal contact information for all partners, officers and/or directors of the owner entity.

## Partner/Officer/Director 1

**Role**
Corporate Officer

**Name**
James  VonAlbade

**Address -   PO Boxes WILL NOT be accepted.**
230 West, 230 West 41st Street, 12 Floor,, New York, New York 10036

**Business No. (8AM- 5PM)**
(646) 833-3991

**Mobile No. (24/7)**
(708) 408-1787

**Email**
jvonalbade@eqr.com

# In-County Agent

**Name**
Jacqueline  Marciano

**Address -   PO Boxes WILL NOT be accepted.**
155 Washington Street, Jersey City, New Jersey 07032

**Business No. (8AM- 5PM)**
(201) 938-0770

**Mobile No. (24/7)**
(518) 361-5516

**Email**
jmarciano@eqr.com

# Managing Agent / Superintendent Information

**Managing Agent Information**
Jacqueline  Marciano

**Address -   PO Boxes WILL NOT be accepted.**
155 Washington Street, Jersey City, New Jersey 07302

**Business No. (8AM- 5PM)**
(201) 938-0770

**Mobile No. (24/7)**
(518) 361-5516

**Email**
jmarciano@eqr.com

**Superintendent Information**
Tony  Santana

**Address**
155 Washington Street, Jersey City, New Jersey 07302

**Business No. (8AM- 5PM)**
(201) 938-0770

**Mobile No. (24/7)**
(201) 937-5230

**Email**
jsantana@eqr.com

**If your property has 6 or more units and your Superintendent does not live on the premises, please follow this hyperlink to submit an On-Site Superintendent Exemption Request**

**\*\*\*Be sure to attach your Tenancy Information/Rent Roll below as your registration will be considered incomplete without this portion of the registration. Tenancy Information/Rent Roll is required under §260-2F(1) of the Jersey City Muncipal Code, whether or not the property is subject to Rent Control.\*\*\***

**Tenancy Information/Rent Roll Upload**
Portside Rent Roll 2021.pdf

**I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.**
Yes

**Principal Owner's Name**
Jim VonAlbade

**Principal Owner's Signature**

**Date**
12/16/2021

*Jim VonAlbade*

**Manager's Name**
Jacqueline Marciano

**Manager's Signature**

**Date**
12/16/2021

*Jacqueline Marciano*

**PRINT BEFORE SUBMITTING**

Once the registration is submitted, you will not be able to access it to update or revise. You must print it

before submitting in order to retain a copy.

**THIS REGISTRATION WILL NOT BE REVIEWED UNTIL PAYMENT IS RECEIVED AND CLEARS THE JERSEY CITY ACCOUNT.**

**The Registration fee can be paid online at: https://www.paylocalgov.com/Payment/SelectEntity/938**

**When paying online, the registration number refers to the street address of the property. The cost is $10 per unit. Note: There is a convenience fee of 2.20% of the total charge for any credit or debit card transaction and $0.50 for any echeck.**

**Alternatively, checks made payable to City of Jersey City may be sent to the Division of Housing Preservation at the address above.**

**However, please note that payment by check will delay the processing of this Registration as no processing will proceed until the check clears the Jersey City account. An individual paying by personal check must include a copy of his/her valid government issued ID. Payment by check or money order by a corporate entity, must be accompanied by in-state registered agent information. In addition, this form must be completed and the required documentation attached: https://www.cognitoforms.com/CityOfJerseyCity1/CheckAcceptanceForm**

{if (Status = "Incomplete")}

**Notice of Incomplete Registration**
{ each NoticeOfIncompleteRegistration }

{Name}

{ end each }

{ end if }

# EXHIBIT B



**Steven M. Fulop**
**Mayor**

# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
**Division of Housing Preservation**
**Office of Landlord/Tenant Relations**
342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

# Notice of Incomplete 2021 Landlord Registration

| | | | |
|---|---|---|---|
| **Date Notice Sent** 12/29/2021 | **Street No.** 155 | **Street Name** Washington Street | **Registration Year** 2021 |

| | | | |
|---|---|---|---|
| **Block** 15902 | **Lot** 1 | **Ward** E | **Number of Units** 527 |

This office is in receipt of the 2021 Landlord Registration Statement (the "Registration") in connection with the Property set forth above. Please be advised that this Registration is incomplete. All questions must be answered in full.  If information is unknown or not applicable, indicate same. The Registration submitted cannot be filed because of the following errors and/or omissions:

## Incomplete/Incorrect Information

### Incomplete/Incorrect Information 1

**Registration Section**
Section A - Property Address/ Ownership Entity Name and Contact

## Correction(s) Needed

### Correction  1

Ownership information provided does not match tax assessment search. (Owners entity name and address)

### Correction  2

Incorrect Block and Lot (see notice)

### Incomplete/Incorrect Information 2

**Registration Section**
Section C - Mortgage

## Correction(s) Needed

### Correction  1

Failure to provide a mortgagee. If no mortgagee, please mark "N/A"

## Incomplete/Incorrect Information 3

**Registration Section**
Section D- Fuel Dealer / Utility Company

# Correction(s) Needed

## Correction  1

Failure to provide fuel dealer and utility company information. If no utility company or fuel dealer, please mark "N/A"

## Incomplete/Incorrect Information 4

**Registration Section**
Section E - Changes

# Correction(s) Needed

## Correction  1

If no hardship rental increase or capital improvements, please mark "N/A"

Please provide a complete Registration within 20 days.  Be advised that failure to provide a complete Registration may subject the Landlord to the issuance of a summons for failure to file a Landlord Registration Statement as required by Jersey City Municipal Code.

Notwithstanding the rejection of the Registration as incomplete, this Office will review the rents set forth in the Registration that has been signed and certified by the Landlord as accurate, and in the event there are rents that this Office deems are in violation of the JC Mun. Code Chapter 260 – Rent Control, the Landlord and any affected tenants will be sent a Rent Leveling Administrator Preliminary Determination regarding such rents. Please be guided accordingly.

**Date Corrected Registration Due**
1/19/2022

**Office Notes**

# EXHIBIT C

![City of Jersey City Seal]

**Steven M. Fulop**
**Mayor**

# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
*Division of Housing Preservation*
*Office of Landlord/Tenant Relations*

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

---

### Notice of Rent Leveling Bureau Determination

**Tenant Petition:** Petitions on the list attached

**Tenant:** Tenants residing at 100 Warren Street on the list attached[1]

**Landlord:** Portside Urban Renewal LLC, owner, c/o Equity Residential Management, LLC, agent, c/o Jennifer L. Alexander, Esq., Griffin Alexander, P.C., 415 Route 10, 2nd Floor Randolph, NJ 07869

**Tenant's Petition:** On various dates commencing in July 2022, the Office of Landlord/Tenant Relations Bureau of Rent Leveling (the "Bureau") received Illegal Rent Petitions signed by the Tenants residing in various apartments as listed on the attached list, (the Tenants names are not included on the list to avoid providing personal identifiers in this document), in which the Tenants ask the Bureau to determine whether the rent increases for their apartments at 100 Warren Street, Jersey City (the "Property" or "100 Warren")[2], comply with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code, (the "Ordinance"). The Petitions have been served on the Landlord by the Tenants and were sent via email to the Landlord by the Bureau on various dates shortly after receipt of the Petition by the Bureau.

**Landlord's Response:** The copies of the Petitions that were sent to the Landlord by the Bureau included an email which stated that a response, if any, was to be submitted to the Tenants and the Bureau. While the names of the Tenants, the tenancy commencement dates, rents, rent increases, and the apartment numbers differ, the issue in connection with all of the Petitions is essentially the same. The question raised is whether the 100 Warren is subject to the rent restrictions of the Ordinance. The Landlord's response, through its attorney, Jennifer L. Alexander, Esq. of Griffin Alexander, P.C., consisted of a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements and a supplemental response which contained additional documentation, specifically a copy of a certificate of Occupancy for 100 Warren dated August 25, 1992,[3]

---

[1] These are tenants who have filed Illegal Rent Petitions and have been served with the Landlord's response.

[2] The Property is designated on the tax map as Block 15902 Lot 1 (formerly Block 60 Lot 34) and includes the two multiple dwellings (the "Towers"). These are referred to as Portside Towers with street addresses of 100 Warren Street and 155 Washington Street. The CO for 155 Washington dated December 31, 1997, delineated the street address as 1 Washington. The street address was subsequently changed to 155 Washington. (Appendix 4)

[3] For ease of reference, documents relied on in this Determination are annexed in the enclosed Appendix.

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 2

(Appendix 1), a "Letter of Exemption" dated November 23, 1994, (Appendix 2), and a
Certificate of Continued Occupancy for 100 Warren dated January 24, 1995. (Appendix 3).

**Discussion**: The Ordinance provides in §260-3 that multiple dwellings with five or more
residential housing spaces are subject to rent regulation.  100 Warren consists of 230 units. Due
to the size of this multiple dwelling, the building is presumed to be rent controlled.  However,
there are exemptions to the rent restrictions of the Ordinance.  The exemption that is relevant
here is an exemption pursuant to State law which is set forth in the Ordinance at §260-6C where
the Ordinance references the exemption for new construction as required by State law, N.J.S.A.
2A:42-84.1 et seq.  As regards this exemption, the Ordinance provides in §260-6C:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions
> of this chapter shall not apply to a new dwelling which is constructed between
> June 25, 1987, through June 25, 1992, and which is not constructed for
> occupation by senior citizens, for a period of time not to exceed the period of
> amortization of any initial mortgage loan obtained for the dwelling, or for 30
> years following completion of construction, whichever is less. This exemption
> applies only where an owner complied with all requirements contained in
> N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal
> construction official required by N.J.S.A. 2A:42-84.4 and the service of a
> written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute").  The
limitation of the exemption from June 25, 1987 through June 25, 1992 was extended several
times and the Statute currently provides in 2A:42-84.5b, "Although this legislation was initially
made effective only for a temporary five-year period, it was expanded for a second five-year
period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56."
The reason for the extension and the final change making the exemption permanent, is also set
forth in the Statute which explicitly explains the legislative purpose as follows: "The Legislature
deems it to be necessary for the public welfare to increase the supply of newly constructed rental
housing to meet the need for such housing in New Jersey."

There are certain requirements for multiple dwellings seeking the statutory exemption
and the question before the Bureau is whether the Landlord has met these requirements.  The
Statute provides in 2A:42-84.3:

> The owner of any multiple dwelling exempted from a rent control or rent
> leveling ordinance pursuant to this act, shall, prior to entering into any lease
> with a person for tenancy of any premises located in the multiple dwelling,
> furnish the prospective tenant with a written statement that the multiple
> dwelling in which the premises is located is exempt from rent control or rent
> leveling for such time as may remain in the exemption period. Each lease
> offered to a prospective tenant for any dwelling unit therein during the period
> the multiple dwelling is so exempted shall contain a provision notifying the
> tenant of the exemption.

In addition, the Statute provides in 2A:42-84.4:

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 3

> The owner of any multiple dwelling claiming an exemption from a rent control
> or rent leveling ordinance pursuant to this act shall file with the municipal
> construction official, at least 30 days prior to the issuance of a certificate of
> occupancy for the newly constructed multiple dwelling, a written statement of
> the owner's claim of exemption from an ordinance under this act, including
> therein a statement of the date upon which the exemption period so claimed
> shall commence, such information as may be necessary to effectively locate
> and identify the multiple dwelling for which the exemption is claimed, and a
> statement of the number of rental dwelling units in the multiple dwelling for
> which the exemption is claimed.

It is undisputed that the Landlord has met the first criteria as set forth in 2A:42-84.3.  The
Tenants' lease and lease renewals all contain a "<u>RENT CONTROL ADDENDUM</u>", (Appendix
5), the title of which is prominently written in capital letters and underlined.  The Addendum
states as follows:

> This Rent Control addendum ("Addendum") is dated and effective as of
> the date on the Residential Lease – Term Sheet (the "Term Sheet") to which
> this Addendum is attached and made a part of (the "Lease") and is made by
> and between Lessor and Resident for the Premises at the Community identified
> in the Lease.

> Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises
> and the Community are exempt from the provisions of any rent control
> ordinances instituted by Jersey City or West New York, as the case may be,
> and said Premises and Community will be exempt from any future rent control,
> rent stabilization or rent leveling ordinance instituted by these municipalities
> for a period of thirty years following the completion of construction at the
> Community.

The Rent Control Addendum provided the Tenants with the notice required by the Statute.

The question remains whether the Landlord complied with the requirements of the Statute
set forth in 2A:42-84.4 which requires that a written statement of the owner's claim be sent to the
municipal construction code official 30 days prior to the issuance of the CO.  On November 23,
1994, Portside Apartments Urban Renewal Partners, L.P., ("Portside") sent a letter to the City
Construction Code Official, Michael Regan, in which Portside claimed an exemption from rent
control pursuant to N.J.S.A. 2A:42-84.1 *et. seq.*, for 229 [sic] units which "shall commence on
the anticipated date of initial occupancy, January 1, 1995." (Appendix 2).  The CO for 100
Warren was issued approximately two years earlier on August 25, 1992. (Appendix 1).

The Landlord explains the delay between the issuance of the CO and the initial
occupancy of 100 Warren.  At the time of the issuance of the CO for 100 Warren, the building
was not open to residents.  The development was intended as a condominium development but
evidently because of economic difficulties, the Property went through foreclosure.  The
Landlord's statement is consistent with the recorded Sherriff's Deed dated November 23, 1994,

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 4

pursuant to which Portside became the new owner/developer of the Property.  (Appendix 6).
The letter sent to the Construction Code Official dated the same day, November 23, 1994, was
sent more than 30 days before the initial occupancy.  This statutory requirement provides notice
to the city official who is in a position to confirm that the dwelling meets the statutory
definitions: that the dwelling is "constructed" (not rehabilitated), is a "multiple dwelling"
(contains four or more dwelling units), and that the construction has been "completed" (that a
CO has been issued).  The developer's letter identifies the Property by address and block and lot,
references the statutory exemption, the number of units[4], and the commencement date of initial
occupancy, January 1, 1995.  In the circumstances, I find that this letter satisfies the notification
requirement of the Statute in 2A:42-84.4.[5]

The Landlord has met the requirements of the Ordinance and the Statute and therefore,
100 Warren was exempt from the rent restrictions in the Ordinance from the date of the CO,
August 25, 1992 for 30 years to August 24, 2022.

With regard to the Landlord's position that the exemption runs from the date of the
Certificate of Continued Occupancy (the "COO"), January 24, 1995, (Appendix 3), this is
without merit.  The Statute is clear that the exemption runs "for a period of time not to exceed
the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for
30 years following completion of construction, whichever is less."  "Completion of construction"
is defined in the Statute and "means issuance of a certificate of occupancy" it does not mean
occupancy.  The fact that the developer chose or was unable to commence renting the units at the
time of the CO in August 1992 does not affect the commencement date of the exemption.

I note that no one has provided the initial mortgage financing.  This is not fatal to the
Landlord's claim of exemption. In Block 268, LLC v. City of Hoboken Rent Leveling &
Stabilization Bd., 401 N.J. Super. 563, 570 (App. Div. 2008), the court found that there was no
requirement in the Statute for the owner to provide mortgage information.  The court referenced
the Statute, specifically, 2A:42-84.6:

> [t]he Legislature . . . declares it to be public policy of this State that, within the
> limitations imposed by this act, the exemptions granted under this act shall not
> be limited, diminished, altered, or impaired during the period of exemption
> afforded.

Id. at 571.  The court noted that the record did not "reveal the terms of the mortgage, if any" and
that in the event it is established that the amortization of the initial mortgage was less than 30

---

[4] The developer's letter incorrectly states the number of units as 229.  The CO states 204 apartments and
26 townhouses. There is also a Developer's Agreement between the City and the initial developer dated
July 23, 1992, which references testimony confirming that 230 units had been completed as of the date of
the agreement.  (Appendix 7). The error in the number of units as stated in the letter is inconsequential
inasmuch as the City was aware that the number of units was 230, not 229.

[5] It seems that the Construction Code Official at the time of Portside's letter, Michael Regan, was
unaware of the requirements of the Statute.  On December 6, 1994, he responded to Portside
acknowledging receipt of its November 23, 1994 letter.  He wrote, "Please be advised that the Office of
Construction Official has no jurisdiction over rent controls and I would suggest that you contact the
proper agency charged with that responsibility." (Appendix 8).

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 5

years, the "order may be amended accordingly." Id. at 572-573.  Similarly, here the exemption is 30 years from the date of the CO unless a mortgage note is submitted proving that the amortization of the initial financing was less than 30 years.

The Landlord has also argued that the Property is exempt because it is located in a redevelopment area, specifically the Tidewater Basin Redevelopment area.  The Ordinance does provide a rent control exemption for new construction in a redevelopment area.  This exemption is found as an exemption from the definition of dwelling in §260-1 as follows:

> Newly constructed dwellings with 25 or more dwelling units located within a redevelopment area as defined in Section 5 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-5(o), for which the City Council has approved a redevelopment plan, in accordance with Section 17 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-17.

While the Landlord is correct that the Property is within the Tidewater Basin Redevelopment Area, the Tidewater Basin Redevelopment Plan is dated November 10, 1999, several years after the Property was constructed and occupied. (Appendix 9).  Portside Towers is a "district" described in the Plan as containing 527 units (the total number of units in both Towers).  The Property was already constructed and occupied at the time of the Plan and therefore was not "new construction" as contemplated by this exemption in the Ordinance.  In fact, the Landlord recognized that the basis for the exemption was the Statute and not the exception for new construction in redevelopment areas as evidenced by the language of the Rent Control Addendum which alerts the Tenants to the exemption "[p]ursuant to N.J.S.A. 2A:42-84.3 … for a period of thirty years following the completion of construction at the Community." (Appendix 5).

The Tenants have raised several issues.  First, the Tenants point out that on some of the annual Landlord Registration Statements, the Landlord has indicated that the Property is not exempt from rent control. The Landlord Registration Statement (the "Registration") is a registration that the Landlord is required to file with the Bureau annually.  In connection with 100 Warren, the Bureau has two Registrations, one filed in 2021 and one filed in 2022.  There are earlier registrations filed under the 155 Washington address, the other Tower at Portside Towers.  It is clear that those Registrations were meant to apply to both Towers inasmuch as they are on the same block and lot and the Registrations state the number of units as "527", the total number of units in both Towers.  It seems that in the past, the Bureau did not always reach out to and obtain Registrations for those multiple dwellings that were exempt from rent control and, because the rents were not regulated, did not follow-up and obtain rent rolls for these properties despite the requirements of the Ordinance.  2017 is the earliest Registration in the Bureau files for the Property.  In 2021, the first year that a rent roll was supplied, the Registration for 155 Washington included a rent roll that included both Towers.

In the Registration, Landlords are asked to state whether the property is subject to rent control. The format of the 2017 – 2019 Registrations asked the question of exemption in this way:

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 6

THIS PROPERTY IS ☐   IS NOT ☐ PRESENTLY UNDER RENT CONTROL

The Registrations for those years contain a check in the box next to "IS NOT" indicating that the Property, according to the Landlord, was not governed by rent control. (Appendix 10). The form was revised in 2020 and the current Registration asks the question, "Is the property you are registering currently under rent control?"  The 100 Warren 2021 Registration an answered "no" and the 2022 Registration answered "yes". (Appendix 11).  Perhaps it was a misreading of the form associated with the change in format that resulted in these answers but whatever the reason, the Landlord's response in the Registration is not dispositive of whether the Property is exempt from rent control.  What is relevant is whether the Property meets the criteria and the requirements of the Ordinance and the Statute.  As set forth in detail above, 100 Warren did qualify and has been exempt from rent control for 30 years, through August 24, 2022.

The Tenants have also relied on a recent unpublished opinion of the New Jersey Appellate Division, Willow Ridge Apts. v. Union City Rent Stabilization Bd., 2022 N.J. Super. Unpub. LEXIS 1232 *; 2022 WL 2525243.  The first page of the decision states prominently, "PLEASE CONSULT NEW JERSEY RULE 1:36-3 FOR CITATION OF UNPUBLISHED OPINIONS." (Appendix 12).  Rule 1:36-3 provides, "No unpublished opinion shall constitute precedent or be binding upon any court".  So, while this decision might be informative, it is not binding on a court and not binding on the Bureau.  In any event, while Willow Ridge also involved the statutory exemption from rent control pursuant to N.J.S.A. 2A:42-84, the facts of this unpublished case are totally distinguishable from the facts here.  In Willow Ridge, there was no evidence that the owner ever applied for the statutory rent control exemption nor was there ever any notice to the tenants of the owner's claim that the building was exempt.  The CO for the multiple dwelling in Willow Ridge was issued in 2002 and no request for exemption was made until 2019 when the new owner argued that the building should be exempt.  Moreover, no tenants were ever notified of this claimed exemption during those 17 years.  The circumstances are very different here where the owner of the Property notified the Construction Code Official of its claimed exemption over 30 days prior to the initial occupancy of 100 Warren and, more importantly, has notified the Tenants in every lease and lease renewal of the claimed exemption.

To summarize, the rents prior to August 24, 2022 were not governed by the Ordinance and the Bureau has no jurisdiction to review or make any findings regarding these rents.  Going forward, the rents charged are restricted by the Ordinance and may not be greater than the allowable CPI for the month.  The CPI for September 2022 is 6.7% and pursuant to the Ordinance, the maximum increase is the CPI or 4% whichever is less.  Therefore, to the extent increases in excess of 4% have been sent to the Tenants, these are allowed up to 4% and the lease renewals must be adjusted accordingly.  Late fees and similar charges must also comply with the Ordinance (§260-1) and may not be in excess of $35.00.  Going forward, lease renewals should not contain the Landlord's "Rent Control Addendum" and the Registrations should indicate that the 100 Warren is currently under rent control.

**Final Determination –** 100 Warren was not subject to the Ordinance therefore the Bureau has no jurisdiction to review or make any findings regarding the rent charged through August 24, 2022.  Going forward, 100 Warren is subject to the rent restrictions of the Ordinance.  To the

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 7

extent the Tenants have been sent notices of rent increases and/or lease renewals, these must comply with the rent restrictions of the Ordinance.  Further, to the extent rent increases for the month of September 2022 were charged and paid, the tenant must receive a rent credit or refund for amounts in excess of the allowed 4% rent increase.

**Signature:** _____

             Dinah Hendon, Rent Leveling Administrator

**Dated:** September 19, 2022

**Notice to Parties**

**This Bureau Determination may be appealed to the Rent Leveling Board by filing a Notice of Appeal with the Bureau within 15 days of receipt of this Determination, no later than October 7, 2022.**

A party appealing this Determination must include in the written notice of appeal:

    a)  The decision (or part thereof) from which review is sought;

    b)  The factual and legal basis for the appeal with citations to the record (ie - registration statements) considered by the Bureau in its determination.

    c)  The notice of appeal must be served upon the other party.

    d)  Except for good cause shown, no appeal shall rely upon any issue of fact or law or upon any documentary evidence not presented to the Bureau.

## 100 Warren Street Petitions

(these Petititons have been responded to by the landlord on or before 9/19/22)

| File No. | | Unit # |
|----------|------------------|--------|
| R22-034 | 100 Warren Street | 1807 |
| R22-035 | 100 Warren Street | 1205 |
| R22-065 | 100 Warren Street | 1401 |
| R22-074 | 100 Warren Street | 208 |
| R22-083 | 100 Warren Street | 1705 |
| R22-092 | 100 Warren Street | 1606 |
| R22-101 | 100 Warren Street | 1515 |
| R22-107 | 100 Warren Street | 502 |
| R22-110 | 100 Warren Street | 1003 |
| R22-111 | 100 Warren Street | 1004 |
| R22-125 | 100 Warren Street | 422 |
| R22-126 | 100 Warren Street | 510 |
| R22-127 | 100 Warren Street | 704 |
| R22-128 | 100 Warren Street | 804 |
| R22-129 | 100 Warren Street | 915 |
| R22-130 | 100 Warren Street | 1709 |

The names of tenants have not been included to avoid providing
personal identifiers.